# IN THE UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF

# MISSISSIPPI



**YURI PETRINI,**

*Plaintiff,*

v. **Civil Action No.** 1:25cv254 HSD-BWR

**CITY OF BILOXI, MISSISSIPPI;**
**JERRY CREEL, in his individual and**
**official capacities;**
**PETER C. ABIDE, in his individual and**
**official capacities;**
**CURRIE JOHNSON & MYERS, P.A., in its**
**capacity as City Attorney;**
**ROBERT G. HARENSKI, in his individual**
**and official capacities;**
**ZACHARY CRUTHIRDS, in his individual**
**and official capacities;**
**J. HENRY ROS, in his individual and**
**official capacities;**
**MICHAEL E. WHITEHEAD, in his individual**
**and official capacities;**
**SIMPKINS & COSTELLI, INC.; and**
**MADELINE COSTELLI PETTRY, P.E., in her**
**individual capacity,**
*Defendants.*

# VERIFIED COMPLAINT AND JURY DEMAND FOR VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. §§ 1983 & 1986

**(First Amendment Retaliation, Fourth Amendment Violations, Due Process Violations, Civil Conspiracy, Failure to Prevent, and Usurpation of Government Functions)**

---

## PRELIMINARY STATEMENT

Plaintiff is proceeding pro se and respectfully requests this Court construe his pleadings liberally, holding them to less stringent standards than formal pleadings drafted by lawyers, and considering substance over form. See Haines v. Kerner, 404 U.S. 519 (1972). Plaintiff has documented disabilities including narcolepsy and recent medical procedures, and respectfully requests reasonable ADA accommodations for scheduling and proceedings as the Court deems appropriate.

# I. INTRODUCTION

1. This is a civil rights action under 42 U.S.C. §§ 1983 and 1986 for First Amendment retaliation, Fourth Amendment violations, due process violations, conspiracy, failure to prevent conspiracy, and usurpation of government functions, led by Currie Johnson & Myers (the City Attorney firm), with Peter Abide as its chief, and attorneys J. Henry Ros and Zachary Cruthirds, all outside contractors who profit by the hour and deliberately inflate conflicts, with participation of several others. Plaintiff, a property owner and state licensed contractor since 2022, filed a federal case on June 6, 2025 with this Court. What transpired in the following 60 days amounts to: death threats with Building Department notes, Sunday surveillance, armed police in tactical positions delivering building violations, persecution, obstruction of justice, and severe constitutional violations with deliberate intent. City officials and counsel manufactured evidence under color of law, conspired with private companies to validate and sanitize their retaliation while maintaining prohibitions and manufacturing grounds to incriminate Plaintiff, created a pretrial diversion that was never intended to occur, and deployed armed police officers for civil code enforcement matters. Plaintiff seeks declaratory relief, compensatory and nominal damages, preliminary and permanent injunctive relief, substantial punitive damages, disgorgement of public funds, and criminal referral.

# II. JURISDICTION AND VENUE

3

2. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. §§ 1983 and 1986 and the First, Fourth, and Fourteenth Amendments.

3. The Court has supplemental jurisdiction over related state-law claims under 28 U.S.C. § 1367(a).

4. Venue is proper under 28 U.S.C. § 1391(b)(1)-(2) because Defendants reside in this District and a substantial part of the events or omissions giving rise to these claims occurred in Harrison County, Mississippi.

5. This Court has authority to award declaratory relief under 28 U.S.C. §§ 2201-2202, injunctive relief, compensatory and punitive damages, and attorneys' fees under 42 U.S.C. § 1988.

## III. PARTIES

5. Plaintiff Yuri Petrini is a resident of Harrison County, Mississippi, and owner of real property at 1606 Beach Boulevard, Biloxi, Mississippi.

6. Defendant City of Biloxi, Mississippi is a municipality organized under the laws of the State of Mississippi and is a "person" within the meaning of 42 U.S.C. § 1983.

7. Defendant Jerry Creel is sued in his individual and official capacities. At all relevant times, he served as Chief Building Official and Director of Community Development for the City of Biloxi. On August 14, 2025, he abdicated his statutory duties by forcing all communications through attorney Ros, who lacks any authority to perform Building Official functions. He is a "person" within the meaning of 42 U.S.C. § 1983.

8. Defendant Peter C. Abide is sued in his individual and official capacities. He serves as City Attorney pursuant to Resolution No. 327-17 (obtained from Biloxi public records)

and supervises Senior Municipal Prosecutor Robert G. Harenski pursuant to Resolution No. 07-01-25 (obtained from City Council minutes). He is a "person" within the meaning of 42 U.S.C. § 1983.

9.  Defendant Currie Johnson & Myers, P.A. is a law firm sued in its capacity as City Attorney for the City of Biloxi pursuant to Resolution No. 327-17 (obtained from Biloxi public records).

10. Defendant Robert G. Harenski is sued in his individual and official capacities. At all relevant times, he served as Senior Municipal Prosecutor for the City of Biloxi. He is a "person" within the meaning of 42 U.S.C. § 1983.

11. Defendant Zachary Cruthirds is sued in his individual and official capacities. At all relevant times, he served as Assistant City Attorney under Peter C. Abide's supervision pursuant to Resolution No. 327-17 (obtained from Biloxi public records), with authority to prosecute and defend City litigation. He is a "person" within the meaning of 42 U.S.C. § 1983.

12. Defendant J. Henry Ros is sued in his individual and official capacities. At all relevant times, he served as Assistant City Attorney under Peter C. Abide's supervision pursuant to Resolution No. 327-17 (obtained from Biloxi public records). Despite having no statutory authority as Building Official or Code Enforcement Officer, Ros has usurped these government functions, issuing building code determinations, making engineering findings, and controlling access to government services while acting under color of state law. He is a "person" within the meaning of 42 U.S.C. § 1983.

13. Defendant Michael E. Whitehead is sued in his individual and official capacities. At all relevant times, he served as Special Counsel under contract to the City, supervised by

Peter C. Abide pursuant to Resolution No. 327-17 (obtained from Biloxi public records). He is a "person" within the meaning of 42 U.S.C. § 1983.

14. Defendant Simpkins & Costelli, Inc. is an engineering firm that was retained by Defendant Ros to provide engineering review services in connection with Plaintiff's property, and participated in the conspiracy to violate Plaintiff's constitutional rights.

15. Defendant Madeline Costelli Pettry, P.E. is sued in her individual capacity. At all relevant times, she served as the Professional Engineer assigned by Simpkins & Costelli, Inc. to review Plaintiff's project, and despite confirming all alleged issues were baseless, was prevented by Defendant Ros from documenting her findings and participated in the conspiracy by allowing her professional judgment to be controlled by non-engineers. She refused to allow Plaintiff to submit or share findings directly with her, despite being warned about the ongoing constitutional violations. She is a "person" within the meaning of 42 U.S.C. § 1983.

16. At all relevant times, all individual Defendants were acting under color of state law or in conspiracy with state actors.

---

# IV. STATEMENT OF FACTS

# I. PROCEDURAL HISTORY

16. On May 30, 2025, Inspector Harbor passed the final inspection at 1606 Beach Boulevard, following previously-passed rough-in inspections. Despite the passed inspection, Harbor

withheld Certificate of Occupancy recommendation, issuing a correction notice citing

four items. The pool shell, visible from U.S. Highway 90 since April 2024, was not cited,

as documented and preserved in Harbor's written correction notice.

17. Between June 2-6, 2025, Plaintiff sought clarification from Harbor and Creel regarding

the correction items and Certificate of Occupancy. City officials did not respond.

18. On June 6, 2025, following the City's non-response, Plaintiff filed suit against the City

and its officials in this Court. *Petrini v. City of Biloxi*, Case No. 1:25-cv-178-LG-RPM.

19. After Plaintiff filed suit, Plan Reviewer Jennifer Polk determined Harbor's four correction

items lacked code support, and the City withdrew all four. Despite stating a Temporary

Certificate of Occupancy would be provided on May 30, 2025, none has issued as of

August 14, 2025 (73 days), leaving the property uninsurable during hurricane season. The

City engaged an outside engineer July 9, 2025, but per Creel's August 8 email, identified

no structural issues.

20. On June 27, 2025, City Attorney Abide denied Plaintiff's records request as "overbroad"

and "a fishing expedition for your federal case" without citing statutory exemptions.

Records custodian Williams confirmed Abide lacked custodial authority, as documented

in preserved written communications.

21. On July 3, 2024, Plaintiff provided City employee Lena deck plans and ICC-ES pool

documentation. After December 2024 concerns, engineer Terry Moran, PE, delivered

revised plans three times through Andrew Harwell and conducted site visits with

Inspector Robert. Plan Reviewer Polk admitted July 3, 2025, to losing these plans.

7

22. The unanchored 1,700-pound pool shell has been visible from U.S. Highway 90 since at least April 2025, positioned on the deck 20 feet above the highway never being an issue until after the lawsuit.

23. On June 30, 2025—twenty-four days post-lawsuit—**two armed officers in tactical position** and two code officials delivered Creel's Stop Work Order. Tara Busby delivered the letter addressed "To Whom it May Concern" citing IRC R114.2 (2021 International Residential Code), as captured in preserved documentation. The order lacked: (1) identified recipient; (2) specific cessation reasons; (3) resumption conditions—violating City Code Article 23-8-6(A)(1) (obtained from Biloxi Municode Library) and IRC R114.2. City Code Article 23-9-5(D)(2) (obtained from Biloxi Municode Library) requires pre-enforcement written notice with ten-day cure period, warning citation, and statement of potential prosecution. Section 5(D)(4) permits prosecution only after failure to correct or appeal. Plaintiff received no such notice before criminal charges.

24. City Code Article 23-9, Section 1 (obtained from Biloxi Municode Library) mandates encouraging "voluntary correction of violations, where possible." Plaintiff received no voluntary correction opportunity.

24a. On July 2, 2025, Creel sent Plaintiff an email acknowledging the proper administrative procedures, stating: "If you wish to challenge this interpretation, you can file an Appeal with the Building Board of Adjustments and Appeals as described in Section R112.2 of the 2021 IRC and Section 5-1-3 of the Code of Ordinances of the City of Biloxi." This email also cited "2021 International Residential Code Section R114.4" regarding stop work order violations. This email outlined administrative steps for compliance, including submitting revised plans and permit

applications—notably, it made no mention of criminal prosecution. Plaintiff has preserved this critical written admission.

25. On July 9, 2025—thirty-three days post-lawsuit—the City issued Criminal Summons CC-00237 (Case No. CC-51719) commanding Plaintiff's July 25, 2025 appearance, the previous 2 business days plaintiff wife accompanied by a third party visited the building department, engaged, discussed, showed documents they claimed to have lost and talked to defendant Creel himself. The summons bore only the clerk's printed signature, was not sworn and not notarized, as documented in court records. Mississippi Rule of Criminal Procedure 2.1(a) requires proceedings commence by charging affidavit, indictment, or information. Rule 3.1(b)(1) permits summons only after complaint filing. No sworn complaint existed when this summons issued.

26. On July 9, 2025, around 1-2 PM, Plaintiff's wife Sumire Maeda hand-delivered engineering documents to Creel - as-built plans, calculations, 3D drawings, PE Terry Moran's letter (Moran had inspected personally twice at Creel's request, Creel specifically picked points of interest in the inspection). Documentary evidence by defendant himself the next day confirms this delivery. Plaintiff had just arrived late that day from the airport after medical procedures, unable to see clearly.

27. On July 10, 2025, Creel went to Deputy Clerk Vanover, the day after summons, and swore out four separate affidavits, all claiming he saw violations at "10 o'clock (am/pm)" at 1606 Beach Boulevard. First affidavit - IRC R105.1 (2021 International Residential Code), installing pool without permit. Second - IRC R105.1, deck not built to approved plans. Third - IRC R114.4 (2021 International Residential Code), working after stop work order. Fourth - IRC R110.1 (2021 International Residential Code), occupying

residence without certificate. Plaintiff has preserved all four sworn affidavits, while all violations alleged stems from one stop work order, defendants choose to extend it to 4 violations.

28. July 10, 2025, Plaintiff had just returned from medical procedures and **hadn't left home that day**. His July 14 email to Creel stated plainly: "was recovering from July 7th surgery...hadn't left home that day," as documented in preserved email communications. Plaintiff as a matter of fact alleged that defendant Jerry Creel committed perjury. Prosecution have not delivered discovery despite granted order from the court.

29. At 10:30 that morning - just 30 minutes after swearing he witnessed violations - Creel emailed Plaintiff about reviewing the engineering calculations from "yesterday afternoon." Confirming receipt, confirm that plaintiff are actively working and taking no shortcuts to cure any alleged deficiency despite of not agreeing, no mention of any violations he supposedly **just** saw. No urgency. Just routine, calm review of documents, as evidenced by preserved email records.

30. Sunday, July 14, 2025, 12:38 PM – Creel personally spent 30 minutes taking pictures of Plaintiff's property. Plaintiff caught him on video and took photos of Creel doing this, as captured in preserved video and photographic evidence, defendant Creel was in his church attire, despite have seen defendant Creel dozens of times at his office, it was the first time that he was wearing that attire, once defendant Creel notice that he was being recorded by plaintiff, he looks extremely surprised, and hastily closed his windows and took off with his car.

31. At 8:38 AM July 14, Creel emailed admitting he was "taking pictures from the public right of way," claiming he saw welders and block layers working, as documented in

preserved emails. Plaintiff fired back at 9:56 AM - pointed out Creel's Sunday surveillance, challenged the July 10 affidavits stating he was at home recovering from medical procedures: "was recovering from July 7th surgery...hadn't left home that day," as preserved in email communications. Creel never responded to address or deny the affidavit allegations.

32. July 21, 2025, Plaintiff amended his federal complaint to add Creel, Abide, and Currie Johnson as defendants. Three days later filed a second case, *Petrini v. City of Biloxi*, Case No. 1:25-cv-233.

# II. THE ORGANIZED SURVEILLANCE OPERATION

33. After Creel filed criminal charges July 10, 2025, the surveillance started.

34. Plaintiff's drone documentation reveals that the Building Department maintains a single unmarked vehicle among an otherwise fully-marked fleet of dozens of vehicles, each clearly labeled "Building Department" or "Code Enforcement."

35. The unmarked Biloxi vehicle #30409 is seen parked at the Building Department car lot; except it has no decal, unlike every other car, as recorded in video. This sole unmarked vehicle was deployed to conduct surveillance of Plaintiff's property, with visible investigation notes documented inside the vehicle.

36. The only unmarked vehicle from the department's fleet was selected for the surveillance operations.

37. Multiple surveillance events occurred after criminal charges were filed, including the July 14, 2025 Sunday surveillance where Creel, dressed in church attire, spent 30 minutes

photographing the property and later admitted in writing to "taking pictures from the public right of way."

38. The surveillance occurred after criminal charges had already been filed July 10, 2025.

# III. THE CONSPIRACY TO SILENCE AND OBSTRUCT

22. Following Plaintiff's June 6, 2025 federal lawsuit, Defendants implemented a coordinated campaign to silence public employees, obstruct public records, and deprive Plaintiff of government services while Defendants' attorneys profited from the constitutional violations.

23. On June 27, 2025, when Plaintiff sought public records essential to his defense, Defendants Cruthirds, Ros, and Whitehead were copied on Abide's denial characterizing the request as a "fishing expedition." These attorneys facilitated the obstruction despite Mississippi Public Records Act requirements for production within seven days. Records custodian Williams confirmed Abide lacked custodial authority (Exhibit G).

24. Following the federal lawsuit filing, City employees who previously communicated with Plaintiff—including Polk, Harbor, and permit staff—ceased all communication. Discovery will show Defendants' attorneys instructed this silence, depriving Plaintiff of government services available to all other citizens.

25. The supervision structure reveals the conspiracy's scope: Per Resolution No. 327-17 (obtained from Biloxi public records), Abide supervises both the civil defense attorneys (Cruthirds, Ros, Whitehead) and per Resolution No. 07-01-25 (obtained from City Council minutes), the criminal prosecutor (Harenski). This unified command structure enabled coordinated retaliation across civil and criminal proceedings, with Ros

specifically positioned to control both civil code enforcement and criminal prosecution

support. This arrangement allows Abide's firm to profit from both defending themselves

in federal court AND prosecuting Plaintiff in municipal court—billing $150/hour for both

sides of the retaliation.

26. Defendants' attorneys bill the City $150/hour pursuant to Resolution 327-17 (obtained

from Biloxi public records) to obstruct Plaintiff's rights while the cease and desist order

prevents Plaintiff from earning any income. The attorneys profit from prolonging

violations while imposing maximum economic pressure on Plaintiff.

27. On June 30, 2025—same day as the Stop Work Order—Defendants Cruthirds, Ros, and

Whitehead filed defensive pleadings (Docs. 11-15) and refused the mandatory Rule 26(f)

conference, as documented in Plaintiff's TRO motion and court records.

28. After their firm was named as defendant on July 17, 2025, these attorneys continued

representation in violation of ethical rules. On July 24, 2025, they manipulated

proceedings by requesting cancellation of the August 5 Case Management Conference,

using their status as unserved defendants to delay proceedings.

29. Defendants Cruthirds, Ros, and Whitehead were copied on all email correspondence

documenting Creel's false affidavits, making them witnesses to the fabrication yet

continuing to facilitate the prosecution.

## III. THE CRIMINAL ARRAIGNMENT

30. On July 25, 2025, Plaintiff appeared for arraignment in Municipal Court on IRC

violations: R110.1 (occupancy without certificate), R114.4 (stop work order violation),

and R105.1 (permits required) under the 2021 International Residential Code. Plaintiff pled not guilty.

31. During arraignment, Senior Municipal Prosecutor Harenski moved for pretrial diversion via written motion. The audio recording confirms neither prosecutor nor Court disclosed the written motion's existence or the Court's ruling thereon. Resolution No. 07-01-25 (obtained from City Council minutes) establishes Harenski "reports to and is supervised by City Attorney Peter C. Abide." Abide is named defendant in both Plaintiff's federal actions.

32. The Court granted prosecution's motion, ordering: "IT IS THEREFORE, ORDERED, the Case is hereby referred for Pre-Trial Diversion. The Defendant is Ordered to attend the Pre-Trial Diversion Conference on 08TH DAY OF AUGUST, 2025, at 10:00 A.M. at the Community Development Department, 676 Dr. Martin Luther King, Jr. Boulevard, Biloxi, Mississippi 39530."

33. The Order stated: "If the Defendant fails to appear for the scheduled Pre-Trial Diversion Conference, this Case is to be immediately placed on the Criminal Docket, and prosecuted accordingly."

34. Plaintiff exercised his party right to record the arraignment. The recording captures the Court's verbal representations regarding pretrial diversion.

35. The recording shows the Court portrayed pretrial diversion as "optional" and "recommended." The Court neither referenced the written motion's existence, nor disclosed ruling thereon, nor mentioned mandatory attendance or automatic prosecution for non-appearance contained in the written order. The recording confirms Plaintiff was never informed of the motion's filing or granting.

36. Plaintiff never received the prosecution's pretrial diversion motion before or during arraignment, denying opportunity to review terms or prepare objections to proposed conditions.

37. During arraignment, Creel stated Plaintiff "never appealed to the board." Plaintiff immediately objected, stating he repeatedly requested appeal procedures never provided. Creel also made several other statements that do not reflect the record. The audio recording captured this exchange, which Plaintiff has preserved.

38. City Code Article 23-2-4(S) (obtained from Biloxi Municode Library) requires Notices of Violation "advise violators of their rights to appeal" to the Board of Zoning Adjustments, and "pending Appeal stays all city actions seeking enforcement." Plaintiff requested appeal information July 2, 25, and 28, 2025, as documented in preserved email communications. The City never provided forms, procedures, or filing venue required under IRC § R112.2 (2021 International Residential Code) and Municipal Code § 5-1-3 (obtained from Biloxi Municode Library).

## IV. THE CEASE AND DESIST ORDER

39. During the July 25, 2025 arraignment, Creel, through prosecutor Harenski, requested a cease and desist order. The June 30, 2025 stop work order cited IRC R114.2 (2021 International Residential Code)—the general provision, not emergency enforcement. Harenski stated: "The city will be asking the court to impose a stop work order," then corrected: "Actually, I misspoke. There's a stop work order already in there. He is not complying with it. We need to cease a desist order from this court." The recording

captures Harenski's unsworn counsel-table assertion: "the work that he is doing is to put people in jeopardy."

40. The recording captures Creel stating "no plans were submitted," despite receiving a complete engineering package from Plaintiff's wife July 9, 2025—one day before his sworn affidavits. The package included 160-page Finite Element Analysis. When Plaintiff presented a stamped PE letter, Creel questioned the engineer's "private relationship" with Plaintiff and challenged the professional certification without contrary engineering evidence. Creel falsely claimed the deck was "connected to the house," when it is completely independent—per Creel's own design requirement.

41. City Code Section 23-9-5(D)(5) (obtained from Biloxi Municode Library) permits emergency enforcement only upon determining "delay in abating the violation would pose danger to public health, safety, or welfare." The order cited IRC R114.2 (2021 International Residential Code), not emergency provisions.

42. The Court's order found: (a) Plaintiff "failed to secure a permit for the installation of a swimming pool"; (b) "despite a stop work order" Plaintiff "continued installation of a swimming pool on a significantly elevated deck"; (c) the deck was "significantly different than the plan originally submitted" requiring additional engineering; (d) no Certificate of Occupancy issued with "ongoing danger to occupants, workers and surrounding property owners should the elevated deck collapse." Plaintiff has preserved this written court order.

43. The order claimed issuance "after a hearing on the request." No separate civil hearing with notice occurred. The "hearing" was the criminal arraignment where Plaintiff answered charges. Plaintiff received no notice of civil injunctive relief request. Plaintiff

objected: "I object, Your Honor, this is not a civil case. This is the criminal proceedings
and this is an arraignment... I was not afforded due process, and the city is trying to
weaponize the opportunity to get an injunction without being the proper forum for that."

44. The Court's "continued installation" finding relied on Creel's affidavits alleging July 10,
2025 observations. Per Paragraph 28, Plaintiff had just returned from medical procedures
and hadn't left home that day, of which Creel was informed.

45. No engineering evidence, expert testimony, or substantive proof supported the alleged
danger. The prosecutor's "jeopardy" assertion came from counsel table without sworn
testimony or documentation. Despite Plaintiff's stamped PE letter supporting structural
integrity, Creel questioned the engineer's credibility without contrary evidence.

## V. DISCOVERY VIOLATIONS

46. On July 25, 2025, the Court granted Plaintiff's Discovery Motion, ordering production
pursuant to Mississippi Rule of Criminal Procedure 17.10.

47. The prosecution has produced no discovery despite the Court's order and Plaintiff's
repeated requests.

48. On August 6, 2025, at 11:00 a.m., Harenski communicated through the clerk he would
only confer with Plaintiff in Abide's presence.

49. The record reflects that Peter C. Abide serves as City Attorney pursuant to Resolution
No. 327-17 (obtained from Biloxi public records) and supervises Mr. Harenski pursuant
to Resolution No. 07-01-25 (obtained from City Council minutes).

50. Mr. Abide is a named defendant in both federal civil rights actions initiated by Plaintiff.

# VI. THE AUGUST 8, 2025 PRETRIAL DIVERSION CONFERENCE

51. Between July 25, 2025, and August 7, 2025, Plaintiff received no communication from the prosecution, the Court, or any City official regarding the procedures for the August 8, 2025 pretrial diversion conference.

52. On August 7, 2025, at 11:35 a.m., Plaintiff transmitted an electronic mail to Jerry Creel, with copies to the Court Clerk, Mr. Harenski, and other City officials, requesting information regarding the August 8 conference, including specific time, location, participants, and procedures.

53. The August 7, 2025 communication noted: "As of 11:30 AM today, August 7, 2025, I have not received any communication regarding: The time of the conference, The location where I should appear, Who will be conducting the conference... Any procedural requirements."

54. Plaintiff received no response to his August 7, 2025 inquiry.

55. On August 8, 2025, at 9:19 a.m., Plaintiff sent a text message to Mr. Creel regarding the conference. Mr. Creel's 2:08 PM email acknowledged receiving this text, stating "I am responding to your earlier text message today," but provided no response until four hours and eight minutes after the mandatory appearance time.

56. On August 8, 2025, at 9:24 a.m., Plaintiff placed a telephone call to Mr. Creel regarding the conference. No response was received.

57. On August 8, 2025, at approximately 1:00 p.m., having received no information regarding the mandatory pretrial diversion conference, Plaintiff filed an Emergency

Motion to Memorialize Lack of Notice, to Compel Rule 17.10 Discovery, for Scheduling

Relief Under Rules 16.1 & 34, and for Other Appropriate Relief.

58. On August 8, 2025, at 2:08 p.m.—four hours and eight minutes after the time specified in

the Court's order for mandatory appearance—Mr. Creel transmitted an electronic mail to

Plaintiff stating:

"I am responding to your earlier text message today concerning the Pre-Trial Diversion Meeting

scheduled for today. At present, I am still awaiting the report from the Consulting Structural

Engineer that we engaged to review the plans you submitted recently for the elevated deck

structure. I have been assured that I will receive the report either today or early next week.

Meeting before the report is received would not be productive since we would not have any of

the conclusions or recommendations from the structural engineer. As soon as I receive the report

and review the conclusions and recommendations, I will contact you to set up the Pre-Trial

Diversion Meeting. It should be in the next few days."

Plaintiff has preserved this critical admission.

66. Mr. Creel's communication states that he had no scheduled intention of conducting the

pretrial diversion conference on August 8, 2025, despite the Court's order requiring

Plaintiff's mandatory attendance on that date. The Court's order provided that failure to

appear would result in the case being "immediately placed on the Criminal Docket, and

prosecuted accordingly." The communication states that fourteen days after obtaining the

cease and desist order, the City still awaited the engineering report, stating they were

"still awaiting the report from the Consulting Structural Engineer."

# VII. DENIAL OF PUBLIC SERVICES THROUGH FORCED ATTORNEY GATEKEEPING

67. On August 14, 2025, at 11:39 AM, while Plaintiff was at the Fifth Circuit building in New Orleans visiting the chamber of Circuit Judge Higginson, Plaintiff received a text message from Jerry Creel's cell phone number that reads: "Yuri, Any communications from this point forward should go through Attorney Hank Ross. Thanks, Jerry Creel," as documented in preserved text message records.

68. Plaintiff responded 20 minutes later with several messages dissuading Jerry Creel from denying government services to a licensed contractor and property owner in Biloxi, alleging that this would hurt his constitutional rights and deny him of public services, to which he received no further response.

69. At 1:00 PM on August 14, 2025, Plaintiff called Currie Johnson firm at 228-385-1010, spoke to receptionist Rachel, and requested to speak to Ros. She attempted to transfer the call, but it returned to her, and she stated Ros was not available. Plaintiff requested a call back and indicated he was also in the city, requesting an in-person meeting if possible.

70. The response came later only by email, with Ros denying any form of communication other than by email, effectively blocking Plaintiff from accessing public services and government officials necessary for resolving code compliance issues.

71. The attorney gatekeeping requirement prevents Plaintiff from obtaining permits, certificates, inspections, and other routine government services available to other citizens.

72. Ros, despite being merely an outside contractor attorney with no statutory authority, has assumed the role of Building Official and Code Enforcement, issuing building code

determinations, making engineering findings without credentials, and controlling access
to all government services.

73. This arrangement allows Ros to bill $150/hour to the City while preventing Plaintiff from
working, creating a financial incentive to prolong the dispute indefinitely.

74. No other property owner in Biloxi is required to communicate with building officials
through a mandatory attorney intermediary, creating an unconstitutional special
requirement applied only to Plaintiff.

# IX. PLAINTIFF'S COMPLIANCE WITH PROSECUTION
# REQUESTS

79. On July 10, 2025, at 10:30 a.m., Mr. Creel acknowledged receiving "engineered
calculations for your deck and pool" from Plaintiff "yesterday afternoon," confirming
receipt of the package delivered by Sumire Maeda on July 9, stating "We are in the
process of verifying the information," as documented in preserved email
communications.

80. On July 14, 2025, Mr. Creel acknowledged that "Terry Moran has submitted numeric
calculations that he says support the structural integrity of the deck, and we have
forwarded those to another structural engineer for verification." Despite this
acknowledgment of receiving stamped engineering calculations from a Professional
Engineer supporting the structure's safety, Mr. Creel stated "the 'Stop Work Order' is still
in effect," as evidenced by preserved written communications.

81. On July 31, 2025, through his engineer, Plaintiff provided to the City structural calculations, architectural as-built plans, construction photographs, and slab details as requested by Mr. Creel.

82. Despite Plaintiff's provision of all requested materials, Mr. Creel continued to assert that additional documentation was required, including reinforcement details, pile cap specifications, and anchor bolt details.

83. Plaintiff has consistently provided all documentation requested by the prosecution while receiving no reciprocal discovery despite this Court's order.

## X. THE PATTERN OF PROCEDURAL EVENTS

84. The record reflects the following sequence of events: a. May 30, 2025: Harbor passes final inspection but issues four correction items (no pool/deck citations) b. June 2-6, 2025: Plaintiff's attempts to resolve correction items meet with silence from City officials c. June 6, 2025: Plaintiff files federal civil rights action after administrative efforts fail d. June 27, 2025: City Attorney characterizes records request as "fishing expedition" e. June 30, 2025: Stop work order issued citing pool/deck (24 days after lawsuit filed) f. June 30, 2025: Attorneys Cruthirds, Ros, and Whitehead file defensive pleadings and refuse Rule 26(f) g. July 2, 2025: Creel acknowledges administrative appeal procedures in writing h. July 9, 2025: Criminal summons issued despite July 2 acknowledgment of administrative remedies; Sumire Maeda delivers engineering package to Creel i. July 10, 2025: Four sworn affidavits executed falsely claiming "no plans submitted" and alleging observations while Plaintiff was at home recovering from medical procedures j. July 14, 2025: Sunday surveillance conducted outside business hours k. July 17, 2025: Plaintiff

amends complaint adding attorney defendants l. July 21, 2025: Plaintiff adds Creel as
defendant in federal litigation m. July 24, 2025: Attorneys request conference
cancellation despite being defendants n. July 25, 2025: Cease and desist order obtained
during criminal arraignment without prior notice o. August 8, 2025: Pretrial diversion
conference ordered but never intended to occur p. August 14, 2025: Creel forces all
communications through attorney Ros q. August 14, 2025: Ros refuses all
communication except email, denying access to services r. Throughout: Attorneys
Cruthirds, Ros, and Whitehead facilitate obstruction s. Throughout: Public employees
silenced from providing required information t. Throughout: Attorneys profit at
$150/hour while preventing Plaintiff from working u. Throughout: Ros usurps Building
Official functions without statutory authority

85. The July 14, 2025 Sunday surveillance occurred while Mr. Creel was dressed in church
attire, as documented in photographs and video preserved by Plaintiff (Exhibit N).

86. Mississippi Rules of Criminal Procedure 3.1(b)(1) requires that a summons may issue
only after a sworn complaint is executed. The summons here preceded the sworn
affidavits by one full day.

87. Prior to Plaintiff filing his federal lawsuit, no enforcement actions had been taken
regarding the pool or deck structure, despite the pool being visible from U.S. Highway 90
since April 2024 and the City possessing ICC-ES documentation since July 3, 2024.

# X. PUBLIC SAFETY CONTEXT

74. The property at 1606 Beach Boulevard contains a 1,700-pound fiberglass pool shell on an elevated deck approximately 20 feet above U.S. Highway 90, in an ASCE 7 Exposure Category D hurricane-prone region.

75. Engineering analysis indicates that design wind conditions would create substantial uplift force on the unsecured pool shell.

76. The pool is an ICC-ES certified product, evaluated by the International Code Council Evaluation Service as meeting building code requirements when installed per the evaluation conditions, as documented in preserved ICC-ES certification materials.

77. The pool shell has remained in the same location on the deck since April 2024, without being anchored, connected to plumbing, or connected to electrical systems.

78. In his July 14, 2025 email, Plaintiff expressed concern about the pool shell becoming airborne in hurricane conditions, stating: "When the 1,700-pound pool shell becomes airborne and kills motorists on [U.S. Highway 90], their blood will be on your hands," as preserved in email communications.

## XI. PRESERVATION OF EVIDENCE

79. Plaintiff has preserved an audio recording of his July 25, 2025 arraignment, which he created as the defendant and party to the proceeding. Mississippi recognizes one-party consent to recording under Mississippi Code § 41-29-531, and Mississippi Rules of Criminal Procedure 1.10 permits pro se litigants to record proceedings in courts without official reporters.

80. The audio recording reflects differences between the Court's verbal representations and its written order regarding the nature of the pretrial diversion program, including the

Court's portrayal of it as "optional" and "recommended" versus the written order's
mandatory language.

81. The audio recording captures Jerry Creel's statement that Plaintiff "never appealed to the
board" and Plaintiff's immediate response documenting his repeated requests for appeal
procedures that were never provided.

82. The audio recording also captures Jerry Creel's false statements that "no plans were
submitted" (despite receiving them July 9) and that the deck was "connected to the
house," as well as his questioning of the Professional Engineer's credibility, and
prosecutor Harenski's unsworn assertion that "the work that he is doing is to put people in
jeopardy" along with Plaintiff's objection that he was "not afforded due process."

83. Plaintiff has preserved the Court's written Cease and Desist Order dated July 25, 2025
(Exhibit D).

84. Plaintiff has preserved all four affidavits sworn by Jerry Creel on July 10, 2025 (Exhibits
J-M), each containing statements of personal observation at 10:00 AM, along with the
Criminal Summons issued July 9, 2025 (Exhibit I).

85. Plaintiff has preserved photographic and video evidence of Jerry Creel's July 14, 2025
Sunday surveillance (Exhibit N), documenting the session conducted outside business
hours.

86. Plaintiff has preserved email correspondence wherein Mr. Creel acknowledges
conducting surveillance and photographing the property (Exhibits O, P, Q).

87. Plaintiff has preserved Jerry Creel's July 2, 2025 email acknowledging administrative
appeal procedures and compliance steps, demonstrating his knowledge of proper
procedures before pursuing criminal prosecution (Exhibit AB).

88. Plaintiff has preserved all email requests for appeal information (Exhibits U, V, W).

89. Plaintiff has preserved evidence of court orders, including the July 28, 2025 confirmation from Senior Clerk Taylor regarding court orders in Defendant Creel's possession (Exhibit T).

90. Plaintiff has preserved Peter C. Abide's June 27, 2025 letter (Exhibit G) regarding Plaintiff's public records request.

91. Plaintiff has preserved Jeff Harbor's May 30, 2025 correction notice showing passed final inspection with four correction items that did not include pool or deck citations (Exhibit AA).

92. Plaintiff has preserved the July 3, 2024 email transmission to Caryle Lena containing ICC-ES pool documentation (Exhibit Y).

93. Plaintiff has preserved documentation of the July 9, 2025 engineering package delivered by Sumire Maeda to Jerry Creel (Exhibit Z).

94. Plaintiff has preserved Jerry Creel's August 8, 2025 email acknowledging that fourteen days after obtaining an emergency cease and desist order, the City still awaited engineering analysis (Exhibit B).

95. Plaintiff has preserved Jerry Creel's August 14, 2025 text message forcing all communications through attorney Ros, and Ros's written refusals to communicate, documenting the conspiracy to deny public services (Exhibits JJ, GG, HH).

96. Plaintiff intends to file said recordings and documents with appropriate tribunals to ensure preservation of evidence and protection of his constitutional rights.

## V. CAUSES OF ACTION

# QUALIFIED IMMUNITY DOES NOT APPLY

183.     All individual Defendants will likely assert qualified immunity, but this defense

fails as a matter of law because:

**A. Clearly Established Rights** 184. The constitutional violations alleged involve clearly

established rights that any reasonable official would understand:

- The First Amendment prohibits retaliation for filing lawsuits against the government—
  one of the most clearly established rights in constitutional law
- The Fourth Amendment prohibits warrantless surveillance for criminal investigations
- Due process prohibits criminal prosecution without following mandatory procedures
- Equal protection prohibits denying government services based on protected activity
- The Constitution prohibits delegating government authority to private contractors with
  profit motives

185.     These rights were so clearly established that the Supreme Court has repeatedly

held no reasonable official could believe violating them was lawful. See *Hartman v.*

*Moore*, 547 U.S. 250 (2006) (retaliatory prosecution); *Carpenter v. United States*, 138 S.

Ct. 2206 (2018) (warrantless surveillance); *Mathews v. Eldridge*, 424 U.S. 319 (1976)

(due process).

**B. Conduct That Shocks the Conscience** 186. Defendants' conduct shocks the conscience and

thus defeats qualified immunity:

- Filing false affidavits claiming to witness violations when Plaintiff was home recovering from medical procedures

- Conducting Sunday surveillance in church attire as personal vendetta

- Using the sole unmarked vehicle from a marked fleet to conceal surveillance

- Forcing attorney gatekeeping at $150/hour while preventing Plaintiff from working

- Obtaining emergency orders without evidence while acknowledging no structural issues

- Threatening sanctions for speaking to engineers about baseless claims

187.    The common law doctrine distinguishes between "unwarranted timidity" and "manufactured aggression." When government officials manufacture aggressive enforcement to create fear and timidity in exercising constitutional rights, they cannot later claim citizens should have been braver. Defendants deliberately created an atmosphere of intimidation—armed police deliveries, Sunday surveillance, false criminal charges, attorney gatekeeping—to manufacture timidity and chill Plaintiff's exercise of clearly established rights. This manufactured aggression defeats any qualified immunity claim. The doctrine prevents officials from creating the very conditions that discourage citizens from exercising their rights, then claiming immunity for the resulting violations.

**C. Malice and Profit-Driven Decisions** 188. Qualified immunity does not protect officials acting with malice or for improper motives:

- Defendant Abide and his firm profit $150/hour from prolonging violations

- Abide supervises both the attorneys defending him in federal court AND the prosecutor attacking Plaintiff in municipal court—an unprecedented conflict

- Defendants filed charges after acknowledging proper administrative procedures

28

- Surveillance occurred after criminal charges, proving consciousness of guilt

- Engineering "findings" were manufactured without engineer authorization

- Ros usurped government functions to maximize billable hours

- Creel abdicated statutory duties to create attorney billing opportunities

- The entire scheme generates hourly fees for Currie Johnson & Myers while preventing Plaintiff from earning any income

189.     Peter Abide's supervision of both civil defense and criminal prosecution while being a defendant himself creates inherent profit-driven conflicts. His firm bills the City for every hour spent obstructing Plaintiff's rights, creating financial incentives to violate the Constitution. Discovery will show the firm has billed over $566,000 to the City while orchestrating these violations. Abide cannot claim immunity while profiting from supervising retaliation against the very lawsuit in which he is named as a defendant.

**D. Deliberate Indifference and Bad Faith** 190. The timeline alone defeats qualified immunity by showing deliberate indifference:

- June 6, 2025: Plaintiff files federal lawsuit

- July 2, 2025: Creel acknowledges administrative procedures

- July 10, 2025: Creel files false criminal charges instead

- July 14, 2025: Sunday surveillance despite having "witnessed" violations

- August 14, 2025: Forces attorney gatekeeping at $150/hour

191.     No reasonable official could believe this pattern of escalating retaliation was lawful.

192.     Defendants cannot claim qualified immunity when they deliberately violated procedures they acknowledged in writing, filed false affidavits, conducted warrantless surveillance, and profited from constitutional violations. Their conduct was so egregious that it forfeits any immunity protection.

193.     The Fifth Circuit has consistently held that qualified immunity does not protect officials who violate clearly established rights with malice, for profit, or through conduct that shocks the conscience. Here, Defendants did all three: they acted with malice in retaliation for Plaintiff's lawsuit, profited at $150/hour from their violations, and engaged in conscience-shocking conduct including false affidavits and Sunday surveillance. No reasonable official could believe this conduct was lawful, and no immunity shields such egregious violations.

## COUNT I - FIRST AMENDMENT RETALIATION

## (42 U.S.C. § 1983 - Against All Defendants)

194.     Plaintiff realleges and incorporates all preceding paragraphs.

195.     Plaintiff engaged in constitutionally protected First Amendment activity by filing federal civil rights lawsuits challenging unconstitutional government action.

196.     Defendants took adverse action against Plaintiff, including initiating criminal prosecution based on false affidavits despite acknowledging proper administrative procedures in writing on July 2, 2025, obtaining cease and desist orders without due process, and obstructing access to government services.

197.    A causal connection exists between the protected activity and adverse action, demonstrated by temporal proximity and direct evidence of retaliatory motive.

198.    Defendants' actions would chill a person of ordinary firmness from continuing to exercise their First Amendment rights.

199.    As a direct and proximate result, Plaintiff suffered damages including loss of property use, economic harm, emotional distress, and deprivation of constitutional rights.

# COUNT II - FOURTH AMENDMENT VIOLATIONS

# (42 U.S.C. § 1983 - Against Defendants Creel and Abide)

200.    Plaintiff realleges and incorporates all preceding paragraphs.

201.    Once Defendants filed criminal charges on July 10, 2025, any subsequent surveillance transformed from administrative inspection to criminal investigation, triggering Fourth Amendment warrant requirements. The Fourth Amendment prohibits warrantless searches and seizures except in narrowly defined circumstances not present here.

202.    On July 14, 2025—Sunday, outside business hours—Defendant Creel conducted thirty minutes of surveillance at Plaintiff's property while dressed in church attire, using the Building Department's sole unmarked vehicle from an otherwise fully-marked fleet of dozens. This deliberate selection of the only vehicle without government identification, from a fleet where every other vehicle bears "Building Department" or "Code Enforcement" markings, evidences intent to conceal governmental surveillance.

203.     On August 5, 2025, Defendant Creel escalated his violations by trespassing at 929
Division Street, Plaintiff's residence, where he photographed the property and
interrogated Plaintiff's wife without warrant, consent, or legitimate administrative
purpose. This physical intrusion into the curtilage and interrogation of family members
constitutes a clear Fourth Amendment violation requiring suppression of all evidence
obtained.

204.     The surveillance violated Fourth Amendment requirements because: (a) criminal
charges had been filed, converting any inspection to criminal investigation; (b) no
warrant was obtained; (c) no exigent circumstances existed; (d) the surveillance occurred
on Sunday when the Building Department was closed, negating any administrative
purpose; (e) the unmarked vehicle concealed government action; (f) the August 5 trespass
violated the sanctity of the home; and (g) the surveillance targeted Plaintiff based on his
federal litigation, not legitimate law enforcement needs.

205.     Under *Camara v. Municipal Court*, 387 U.S. 523 (1967), even administrative
inspections require adherence to constitutional standards. Here, Defendants abandoned all
standards: conducting surveillance after criminal charges eliminated administrative
justification, using government resources on personal time, trespassing on private
property, and deploying deceptive practices to evade Fourth Amendment constraints.

206.     The temporal sequence proves malicious purpose: June 6 (federal lawsuit filed)
→ July 10 (criminal charges filed) → July 14 (Sunday surveillance) → August 5
(trespass and interrogation). This pattern demonstrates the surveillance was retaliation for
protected activity, not legitimate investigation. Creel's admission of "taking pictures from

the public right of way" cannot sanitize warrantless criminal investigation conducted under color of law.

207.     As a direct and proximate result, Plaintiff suffered constitutional violations, was forced to implement security measures, and endured the chilling of his First Amendment rights through targeted government surveillance designed to intimidate rather than investigate.

# COUNT III - CONSPIRACY TO VIOLATE CIVIL RIGHTS - MAIN CONSPIRACY

# (42 U.S.C. § 1983 - Against All Defendants Except Simpkins & Costelli, Inc. and Pettry)

207.     Plaintiff realleges and incorporates all preceding paragraphs.

208.     Defendants City of Biloxi, Creel, Abide, Currie Johnson & Myers, Harenski, Cruthirds, Ros, and Whitehead reached an understanding to violate Plaintiff's constitutional rights through coordinated retaliation for his protected First Amendment activity.

209.     These Defendants committed overt acts in furtherance of the conspiracy, including: a. Coordinating civil defense and criminal prosecution under Abide's supervision b. Filing false affidavits to support baseless criminal charges c. Deliberately bypassing administrative procedures Creel acknowledged in writing on July 2, 2025 d. Obstructing public records access essential to Plaintiff's defense e. Silencing public

employees from communicating with Plaintiff f. Refusing mandatory Rule 26(f) conferences while pursuing prosecution g. Continuing representation despite irreconcilable conflicts of interest h. Profiting at $150/hour while preventing Plaintiff from earning income i. Conducting warrantless surveillance using unmarked vehicles j. Denying public services through forced attorney gatekeeping k. Ros usurping Building Official and Code Enforcement functions without authority l. Manufacturing engineering findings without engineering credentials

210.      The conspiracy involved state actors exercising power under color of state law pursuant to Resolution Nos. 327-17 and 07-01-25 (both obtained from Biloxi public records).

211.      As a direct and proximate result of the conspiracy, Plaintiff suffered violation of his First and Fourth Amendment rights and other constitutional protections.

## COUNT IV - CONSPIRACY TO MANUFACTURE FALSE ENGINEERING JUSTIFICATION

## (42 U.S.C. § 1983 - Against Currie Johnson & Myers, Abide, Cruthirds, Ros, Whitehead, Simpkins & Costelli, Inc., and Pettry)

212.      Plaintiff realleges and incorporates all preceding paragraphs.

213.    Defendants Currie Johnson & Myers and its attorneys Abide, Cruthirds, Ros, and Whitehead conspired with Simpkins & Costelli, Inc. and Pettry to manufacture false engineering justifications for constitutional violations.

214.    These Defendants committed overt acts including: a. Hiring engineers specifically because of lawsuit, not safety concerns b. Fabricating engineering findings that actual engineer never made c. Threatening sanctions to prevent engineer from documenting baseless claims d. Simpkins & Costelli and Pettry allowing Ros to control engineering opinions despite confirming all issues were baseless e. Pettry requiring Ros's permission to communicate engineering findings, abandoning professional independence f. Pettry refusing to allow Plaintiff to submit or share any findings directly with her, despite being warned about the conspiracy g. Simpkins & Costelli accepting engagement knowing it was for litigation defense, not public safety h. Ros misrepresenting engineering findings in official correspondence i. Preventing resolution when engineers agreed issues were baseless

215.    This conspiracy was specifically designed to create post-hoc justification for retaliation against Plaintiff's protected First Amendment activity.

216.    As a direct and proximate result, Plaintiff suffered continued prosecution, property restrictions, and denial of constitutional rights.

# COUNT V - CONSPIRACY TO MANIPULATE JUDICIAL PROCEEDINGS

## (42 U.S.C. § 1983 - Against Defendants Creel and Harenski)

217.     Plaintiff realleges and incorporates all preceding paragraphs.

218.     Defendants Creel and Harenski conspired to manipulate municipal court proceedings to obtain relief beyond the court's jurisdiction and to deprive Plaintiff of due process.

219.     These Defendants committed overt acts including: a. Seeking civil injunctive relief during criminal arraignment b. Presenting emergency allegations without sworn testimony or evidence c. Pushing municipal court beyond its typical jurisdiction d. Making false statements on the record that Plaintiff never appealed e. Claiming "no plans were submitted" despite receiving them July 9, 2025 f. Obtaining cease and desist order without notice or hearing g. Defying court-ordered discovery for 21 days h. Creating pretrial diversion trap to trigger automatic prosecution

220.     The conspiracy involved using municipal court as a weapon to punish Plaintiff's protected First Amendment activity.

221.     As a direct and proximate result, Plaintiff suffered deprivation of property rights, due process violations, and ongoing criminal prosecution.

222.     All conspiracies demonstrate deliberate indifference to Plaintiff's constitutional rights and warrant punitive damages against all individual defendants.

# COUNT VI - FAILURE TO PREVENT CONSPIRACY - JERRY CREEL

## (42 U.S.C. § 1986 - Against Defendant Jerry Creel)

223.    Plaintiff realleges and incorporates all preceding paragraphs.

224.    Defendant Jerry Creel had actual knowledge of the conspiracy described in
Counts III, IV, and V to violate Plaintiff's constitutional rights through coordinated
retaliation, false engineering justifications, and manipulation of judicial proceedings.

225.    As Chief Building Official and Director of Community Development, Creel
possessed the power and authority to prevent or aid in preventing the commission of
these conspiracies and the resulting constitutional violations.

226.    Creel's position gave him authority to: correct false statements in his affidavits;
halt the organized surveillance operation; provide required appeal procedures; cease
obstruction of public records; stop the denial of government services; and prevent the
manipulation of municipal court proceedings.

227.    Despite having knowledge of the ongoing conspiracies and possessing the power
to prevent them, Creel neglected and refused to exercise reasonable diligence to prevent
the conspiracies from achieving their unlawful objectives.

228.    Creel actively participated in and facilitated the conspiracies rather than
preventing them, including filing false affidavits, conducting unauthorized surveillance,
and making false statements in court proceedings.

229.    As a direct and proximate result of Creel's failure to prevent the conspiracies
despite having the power and duty to do so, Plaintiff suffered damages including
deprivation of constitutional rights, economic losses, emotional distress, and denial of
due process.

# COUNT VII - FAILURE TO PREVENT CONSPIRACY - MADELINE COSTELLI PETTRY

## (42 U.S.C. § 1986 - Against Defendant Madeline Costelli Pettry, P.E.)

230.     Plaintiff realleges and incorporates all preceding paragraphs.

231.     Defendant Pettry had actual knowledge of the conspiracy described in Count IV to manufacture false engineering justifications to support constitutional violations against Plaintiff.

232.     As a licensed Professional Engineer assigned to review Plaintiff's project, Pettry possessed the power and professional obligation to prevent the conspiracy by: documenting her actual engineering findings; refusing to allow non-engineers to control her professional opinions; reporting attempts to manipulate engineering conclusions; and maintaining professional independence as required by engineering ethics.

233.     Pettry admitted to witnesses at the Simpkins & Costelli office that all alleged engineering issues were baseless, yet allowed Defendant Ros to prevent her from documenting these findings and to misrepresent her professional conclusions.

234.     When Plaintiff attempted to communicate directly with Pettry to submit engineering documentation and obtain her actual findings, Pettry refused to allow Plaintiff to submit or share any findings with her, despite being warned about the constitutional violations and conspiracy occurring. Pettry insisted that all

communications must go through Defendant Ros, abandoning her professional independence and enabling the conspiracy to continue.

235.    Despite having knowledge that Ros and others were conspiring to manufacture false engineering justifications, and possessing the power as a licensed Professional Engineer to prevent this conspiracy by simply documenting the truth and accepting Plaintiff's submissions directly, Pettry neglected and refused to exercise reasonable diligence to prevent the conspiracy.

236.    Pettry's failure to prevent the conspiracy was particularly egregious given her professional ethical obligations as a licensed engineer to protect public safety and maintain professional integrity, which she abandoned by allowing attorneys to control her engineering opinions and refusing direct communication with the property owner.

237.    As a direct and proximate result of Pettry's failure to prevent the conspiracy despite having the power and professional duty to do so, Plaintiff suffered continued prosecution, property restrictions, economic damages, and deprivation of constitutional rights.

# COUNT VIII - CONSPIRACY TO DENY PUBLIC SERVICES AND USURP GOVERNMENT FUNCTIONS

# (42 U.S.C. § 1983 - Against Defendants Creel and J. Henry Ros)

238.    Plaintiff realleges and incorporates all preceding paragraphs.

239.     Defendants Creel and Ros conspired to deny Plaintiff access to public services
and government functions by forcing all communications through Ros, an outside
contractor attorney who lacks any statutory or regulatory authority to perform building
official or code enforcement functions. This conspiracy is fully documented on the record
through text messages, emails, and written correspondence.

240.     On August 14, 2025, this conspiracy was fully documented on the record when
Creel texted Plaintiff: "Yuri, Any communications from this point forward should go
through Attorney Hank Ross. Thanks, Jerry Creel." This created a documentary record of
the unconstitutional delegation of government authority to a private contractor, as
preserved in text message records.

241.     Ros, acting under color of state law despite being merely an outside contractor
attorney billing $150/hour, has usurped the positions and authority of both the Building
Official and Code Enforcement, including: a. Issuing building code determinations
without statutory authority b. Making engineering findings without engineering
credentials c. Controlling access to building permits and certificates d. Preventing direct
communication between property owners and government officials e. Blocking Plaintiff
from submitting documentation to actual government employees f. Manufacturing
engineering findings that the actual engineer never made g. Threatening sanctions against
anyone who attempts to bypass his gatekeeping h. Writing official letters on August 13
and 14, 2025, claiming to make engineering determinations and building code findings
despite lacking any professional qualifications or statutory authority to do so, as
documented in preserved written communications

242.     When Plaintiff attempted to contact Ros on August 14, 2025, Ros refused all
forms of communication except email, effectively creating an impenetrable barrier
between Plaintiff and government services available to all other citizens. This refusal is
documented in preserved written communications.

243.     This conspiracy violates fundamental principles of government accountability by
allowing a private contractor to exercise governmental powers without oversight, without
statutory authority, and without the constitutional constraints that bind actual government
officials.

244.     Ros has no appointment, no oath of office, no statutory powers, and no regulatory
authority to:

- Issue building code interpretations
- Make engineering determinations
- Control building permits
- Deny certificates of occupancy
- Block access to government officials
- Act as mandatory intermediary for government services

245.     By forcing all communications through Ros, Creel has effectively abdicated his
statutory duties as Building Official and transferred governmental power to a private
attorney who profits from prolonging disputes at $150/hour.

246.     This conspiracy denies Plaintiff equal protection under the law by subjecting him
to requirements not imposed on other property owners, who can communicate directly
with building officials without attorney gatekeepers.

247.    The conspiracy also violates due process by creating an unconstitutional

delegation of governmental authority to a private party with financial incentives to

obstruct resolution.

248.    As a direct and proximate result of this conspiracy, Plaintiff has been denied

access to:

- Building permits
- Certificates of occupancy
- Appeal procedures
- Inspection services
- Code clarifications
- Public records
- All routine government services available to other citizens

249.    This conspiracy demonstrates deliberate indifference to Plaintiff's constitutional

rights and warrants substantial punitive damages against both Creel and Ros.

# COUNT IX - VIOLATION OF DUE PROCESS THROUGH

# DELIBERATE CIRCUMVENTION OF

# ADMINISTRATIVE PROCEDURES

# (42 U.S.C. § 1983 - Against Defendant Jerry Creel)

250.    Plaintiff realleges and incorporates all preceding paragraphs.

251.     On July 2, 2025, Defendant Creel sent Plaintiff a written communication
explicitly acknowledging the proper administrative procedures for addressing alleged
building code violations, stating: "If you wish to challenge this interpretation, you can file
an Appeal with the Building Board of Adjustments and Appeals as described in Section
R112.2 of the 2021 IRC and Section 5-1-3 of the Code of Ordinances of the City of
Biloxi."

252.     In this same July 2, 2025 communication, Creel acknowledged that the proper
remedy for alleged violations was administrative compliance, stating the "steps that will
need to be taken" to "come into compliance" included submitting revised plans and
permit applications—all administrative remedies, not criminal prosecution.

253.     Despite this written acknowledgment of administrative procedures, Creel
deliberately circumvented these procedures by: a. Filing criminal charges on July 10,
2025, without providing any opportunity for administrative appeal b. Never providing the
appeal forms or procedures despite Plaintiff's repeated requests on July 2, 25, and 28,
2025 c. Telling Plaintiff about appeal rights on July 2, then withholding the actual means
to exercise those rights d. Swearing false affidavits to support criminal prosecution rather
than following administrative process e. Violating City Code Article 23-9-5(D)(2)
(obtained from Biloxi Municode Library) requiring written notice with ten-day cure
period before prosecution f. Violating City Code Article 23-9-5(D)(4) (obtained from
Biloxi Municode Library) permitting prosecution only after failure to correct or appeal g.
Violating City Code Article 23-9, Section 1 (obtained from Biloxi Municode Library)
mandating "voluntary correction of violations, where possible"

254.     Creel's July 2, 2025 email constitutes a binding admission that:

- Administrative remedies existed for the alleged violations
- Criminal prosecution was not the appropriate initial response
- Appeal procedures were available under both IRC and City ordinances
- Compliance could be achieved through administrative processes

255.    By pursuing criminal prosecution eight days after acknowledging administrative remedies, Creel violated Plaintiff's due process rights by: a. Depriving him of pre-deprivation process required by law b. Denying access to the Building Board of Adjustments and Appeals c. Bypassing mandatory notice and cure provisions d. Subjecting him to criminal penalties without exhausting administrative remedies e. Acting in bad faith by acknowledging proper procedures then violating them

256.    Creel's actions demonstrate deliberate indifference to established procedures and conscious disregard for Plaintiff's constitutional rights, as he knew the proper procedures but chose to violate them for retaliatory purposes.

257.    The timing is dispositive of retaliatory intent: Creel's July 2, 2025 acknowledgment of administrative procedures came 26 days after Plaintiff filed his federal lawsuit on June 6, 2025, yet eight days later Creel pursued criminal prosecution instead of the administrative remedies he had just acknowledged.

258.    This violation is particularly egregious because Creel used his position to both:

- Acknowledge administrative remedies in writing to create appearance of compliance
- Simultaneously pursue criminal prosecution in violation of those same procedures

259.    As a direct and proximate result of Creel's deliberate circumvention of administrative procedures, Plaintiff suffered criminal prosecution, cease and desist

orders, property restrictions, economic damages, and deprivation of due process rights that would have been avoided through proper administrative channels.

260.　　Creel's deliberate violation of known procedures after acknowledging them in writing demonstrates malice warranting substantial punitive damages.

# COUNT X - CONSPIRACY TO EFFECTUATE UNCONSTITUTIONAL TAKING

# (42 U.S.C. § 1985(3) - Against Defendants Creel, Abide, and Ros)

261.　　Plaintiff realleges and incorporates all preceding paragraphs.

262.　　Defendants Creel, Abide, and Ros conspired to deprive Plaintiff of equal protection and property rights by orchestrating a complete taking through indefinite Certificate of Occupancy denial.

263.　　After Plaintiff's property passed inspection May 30, 2025, Defendants agreed to effectuate a taking without compensation. Abide supervised both civil defense and criminal prosecution while defendant himself; Creel abdicated statutory duties to create the gatekeeping scheme; Ros assumed unauthorized control over permits—all to render Plaintiff's property worthless while billing $150/hour.

264.　　The property remains unoccupiable, uninsurable, unmarketable—complete economic wipeout for four months. Pettry needed only photos and site visit to resolve,

but Ros blocked her while maintaining the fiction. No compensation while Defendants profit from the deprivation they created.

265.     Only Plaintiff faces mandatory attorney gatekeeping for routine certificates. Only his property sits idle four months after passing inspection. This unique treatment targets him as a federal civil rights plaintiff.

266.     Defendants committed overt acts including: Creel forcing communications through Ros; Abide controlling prosecution/defense; Ros refusing all communication except email; manufacturing baseless engineering concerns; creating pretrial trap; withholding CO despite no legitimate grounds.

267.     As a direct and proximate result of this conspiracy, Plaintiff suffered complete loss of property use, inability to insure during hurricane season, and ongoing economic losses while Defendants profit from the harm they orchestrate.

# COUNT XI - FAILURE TO PREVENT TAKING CONSPIRACY

## (42 U.S.C. § 1986 - Against Defendants Harenski and Pettry)

268.     Plaintiff realleges and incorporates all preceding paragraphs.

269.     Defendants Harenski and Pettry had actual knowledge of the conspiracy described in Count X to effectuate an unconstitutional taking through Certificate of Occupancy denial.

270.     Defendant Harenski had knowledge of the § 1985(3) conspiracy through supervising attorney Abide, possessed prosecutorial power to prevent it by providing court-ordered discovery and exposing the sham proceedings, but instead facilitated the conspiracy by withholding discovery 21+ days and refusing to meet without Abide present.

271.     Defendant Pettry had knowledge issues were baseless and needed only photos/site visit, possessed professional engineering authority to end the taking by documenting findings, but allowed Ros to control her professional judgment and refused direct communication with Plaintiff despite warnings about the conspiracy.

272.     Despite having knowledge of the conspiracy and possessing the power to prevent it, both Defendants neglected and refused to exercise reasonable diligence to prevent the conspiracy from achieving its unlawful objectives.

273.     As a direct and proximate result of Defendants' failure to prevent the conspiracy despite having the power and duty to do so, Plaintiff suffered continued property deprivation, economic damages, and denial of constitutional rights.

# COUNT XII - MUNICIPAL LIABILITY UNDER MONELL

## (42 U.S.C. § 1983 - Against City of Biloxi)

274.     Plaintiff realleges and incorporates all preceding paragraphs.

275.     The constitutional violations alleged herein were caused by final policymakers whose decisions represent official City policy: Jerry Creel as Chief Building Official and Director of Community Development possessed final authority over building permits and code enforcement; Peter C. Abide as City Attorney pursuant to Resolution 327-17 possessed final authority over legal strategy and prosecution decisions; Robert G. Harenski as Senior Municipal Prosecutor possessed final prosecutorial discretion. Each acted with final policymaking authority in their respective domains.

276.     These policymakers established and implemented an official policy of retaliating against federal civil rights plaintiffs through: coordinated use of criminal prosecution to bypass administrative procedures; delegation of governmental functions to private attorneys lacking statutory authority; denial of public services through mandatory attorney gatekeeping applied selectively; and systematic obstruction of constitutional rights.

277.     Alternatively, the City maintained customs so persistent and widespread as to constitute official policy: allowing Building Officials to file false affidavits without consequence; conducting warrantless surveillance for non-administrative purposes; prosecuting citizens without following mandatory notice and cure provisions; permitting outside attorneys to usurp governmental functions for profit.

278.     The City demonstrated deliberate indifference to constitutional violations through its failure to train or supervise: Creel faced no consequences for false affidavits or Sunday surveillance; Abide supervised both prosecution and defense while defendant himself; Harenski withheld court-ordered discovery without sanction; the City paid $150/hour for attorneys to violate Plaintiff's rights.

279.    The City's deliberate indifference is further evidenced by its response to Plaintiff's
repeated warnings. Plaintiff in countless communications implored Creel not to corrupt
his engineer, providing legal justification why such interference violated professional
standards. Yet Ros, in official correspondence, claimed "witness and expert" tampering
while ignoring that Plaintiff merely sought professional assessment of his own
structure—a structure he built, owns, and whose safety determination requires licensed
professional evaluation. The distinction is dispositive: Creel's interference with Terry
Moran constitutes witness tampering; Plaintiff's consultation with professionals about his
own property constitutes due diligence. That Defendants suddenly moved for "a hearing"
after cancelling the previous Rule 16(f) conference on false grounds, while
simultaneously threatening sanctions for Plaintiff's legitimate engineering consultations,
demonstrates the City's policy of weaponizing legal processes against civil rights
plaintiffs.

280.    The City's deliberate indifference extends to concealment of court orders.
Following the July 25, 2025 arraignment, Plaintiff was subjected to a cease and desist
order he was not provided. On July 28, 2025, Senior Clerk Taylor confirmed at 9:29 AM
that Creel possessed court orders issued against Plaintiff. Despite Plaintiff's explicit
demand—"You are not a judge. You have no authority to conceal court orders from the
party they target"—Creel refused to provide the orders while simultaneously enforcing
them. Plaintiff was forced to obtain the orders through public records requests, and the
documents obtained appear to differ from those being enforced, which discovery will
reveal. This practice of concealing judicial orders from affected parties while enforcing

them violates the most fundamental principles of due process and demonstrates the City's policy of denying basic procedural rights.

281.    The City's deliberate indifference is conclusively established by the silence of Richard, Biloxi's Chief Administrative Officer, who was copied on most correspondence documenting these violations. Creel himself introduced Richard via email as the appropriate City official, yet despite Plaintiff's direct outreach and Richard being copied on communications detailing false affidavits, illegal surveillance, sham proceedings, and constitutional violations, Richard never once responded or intervened. The CAO's complete silence while receiving real-time notice of ongoing constitutional violations by multiple department heads demonstrates the City's highest administrative official's acquiescence to—and ratification of—the retaliatory scheme.

282.    The City's ratification extends throughout its governance structure. Walt Warren (Walt_Warren@ajg.com), the City's outside insurance consultant, and Richard Weaver, Creel's superior, were copied on substantial correspondence documenting these constitutional violations. City Council members were also copied, with one Council member initially responding to schedule a property visit, only to cancel the day of the visit and never respond again—demonstrating how Defendant Abide's influence silenced even elected officials. The City's insurance consultant's knowledge is particularly significant—the City knew its conduct exposed it to liability yet continued the violations. When a municipality's insurance carrier, CAO, department superiors, City Council, and multiple high-level officials all receive real-time documentation of false affidavits, illegal surveillance, sham proceedings, and systematic rights violations, yet none intervene, such

widespread knowledge and acquiescence establishes that the constitutional violations were not aberrant conduct but ratified City policy.

283.    The pervasive nature of Defendants' control is evidenced by the legal community's response. Multiple local attorneys with whom Plaintiff had relationships refused representation, explicitly citing fear of retaliation. When informed of the events, several attorneys stated they were "not surprised"—demonstrating common knowledge of Defendants' unconstitutional practices. Multiple citizens, including past Council members, warned Plaintiff to "be careful for his life," evidencing that even former elected officials recognize the physical danger posed by current City officials. When past Council members—those who once held positions of authority—warn citizens about mortal threats from their successors, the municipality has crossed from constitutional violations into organized intimidation. If Defendants were judged by the appearance of impropriety standard applicable to public officials, the overwhelming evidence of corruption, intimidation, and constitutional violations would render any defense impossible. When an entire legal community fears retaliation, past elected officials warn of mortal danger, and current Council members are silenced mid-action, the municipality has abandoned the rule of law.

284.    As a direct and proximate result of these official policies, customs, and deliberate indifference, Plaintiff suffered all constitutional violations alleged herein, establishing municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

# VI. CONCLUSION

285.     This Court faces a binary determination of extraordinary consequence: either

Plaintiff is completely delusional, or the City of Biloxi has devolved into lawless territory

where outside contractors exercise unlimited governmental power while enriching

themselves through interlocking conflicts of interest.

286.     The evidence compels only one conclusion. In Biloxi, outside contractor attorneys

deny public records about their own billing. They claim authority to characterize

legitimate document requests as "fishing expeditions" while controlling police

deployment, prosecutorial decisions, and municipal court outcomes. Peter Abide's

spouse, Julie Abide, operates as a realtor benefiting from her husband's position of

power. His law partner Amanda Seymour—married to Professional Engineer Mark

Seymour who holds extensive public works contracts with the City—creates a perfect

conflict loop where the law firm controls both legal and engineering aspects of City

operations. Together they openly own real estate with the City, including the very

headquarters building recently on the market for $3.7 million. Most egregiously, both

Amanda Seymour and Peter Abide serve as board lawyers for two public utility

companies headquartered in Biloxi that operate as City vendors and provide essential

services to the City. Mark Seymour, the hidden partner, leverages his wife's law firm

position to secure lucrative public works contracts while his engineering decisions affect

the very properties and projects the law firm prosecutes citizens over. This web of

control—where the same families dominate legal services, engineering contracts, utility

governance, real estate ownership, and prosecution decisions—creates absolute power

without accountability.

287.    When outside contractors can simultaneously defend themselves in federal court while prosecuting their accusers in municipal court—billing $150/hour for both sides— the rule of law has collapsed. When they can deny citizens basic permits, force attorney gatekeeping, and orchestrate sham proceedings while past Council members warn citizens to fear for their lives, this transcends individual injury.

288.    This is no longer about one person's problem with local government. This is about whether federal courts will tolerate municipalities that operate as criminal enterprises, where constitutional rights are commodities to be denied for profit, where elected officials are silenced, where lawyers fear to practice law, and where citizens receive death warnings from former government officials about current ones.

289.    If this conduct stands, no property owner, no business, no citizen in Biloxi is safe from arbitrary deprivation of rights by contractors who have captured governmental power for private profit. The Court's decision will determine whether the Constitution still governs in Biloxi, Mississippi, or whether it has become, as the evidence suggests, a lawless territory where outside contractors exercise absolute power while enriching themselves through the systematic violation of citizens' fundamental rights.

290.    When an FBI agent sits on the edge of their seat, unable to wait to hear what transpired at a municipal criminal arraignment, this Court knows the situation has transcended ordinary municipal corruption into something far more sinister. Federal law enforcement's acute interest in these proceedings confirms what the evidence establishes: Biloxi operates not as a constitutional municipality but as a criminal enterprise masquerading as government. The very fact that federal agents monitor municipal

arraignments with such intensity demonstrates that even law enforcement recognizes the extraordinary danger these Defendants pose to the rule of law.

291.     The depth of this criminal enterprise is revealed through its systematic subversion of legal process. Defendants manufactured evidence to support baseless charges. Prosecutor Harenski motioned for pretrial diversion he never intended Plaintiff to attend—creating a trap designed to fail. The City prosecuted on a summons issued July 9 before any sworn affidavit existed on July 10, violating Mississippi Rule of Criminal Procedure 3.1(b)(1). Discovery motions granted by the Court were never delivered despite 21 days passing. When Plaintiff attempted to file police reports documenting false affidavits, illegal surveillance, and criminal conspiracy, Biloxi police refused to even accept the reports—protecting the conspirators rather than the citizen. This pattern— manufacturing evidence, creating procedural traps, violating criminal procedure, withholding discovery, and denying police protection—demonstrates that every level of Biloxi government participates in the criminal enterprise. When police refuse to take reports against city officials, prosecutors create sham proceedings, and evidence is manufactured with impunity, the municipality has ceased to function as a government and operates solely as an organized criminal conspiracy under color of law.

292.     The extraordinary nature of Biloxi's corruption is confirmed by the universal discomfort it generates among legitimate law enforcement. When presented with this evidence, county sheriffs, federal agencies, and external government personnel become visibly disturbed—their professional composure shattered by the scope of criminality operating under color of law. These seasoned law enforcement professionals, who routinely handle serious crimes, display unprecedented unease when confronted with

Biloxi's conduct. Their reaction speaks louder than words: experienced investigators who have seen corruption before recognize this as something far worse—a complete governmental apparatus weaponized against its citizens. When multiple independent law enforcement agencies outside Biloxi's control react with alarm to the evidence, when federal agents monitor municipal arraignments, when county and state officials express inability to intervene, this Court faces not merely constitutional violations but the complete capture of a municipality by criminal enterprise. The universal law enforcement recognition of this danger underscores the urgent need for federal intervention.

293.    The consciousness of guilt pervading this enterprise is demonstrated by Defendants' response when caught manufacturing evidence. When confronted with proof of their fabrications, Defendant Ros—a licensed attorney who usurped governmental authority he never possessed—responded not with denial or correction but with escalating threats. He claimed "witness protection" for the City's "expert" who participated in the conspiracy, moved for sanctions against Plaintiff for exposing the scheme, then casually asked "do you oppose for a conference next week?" as if threatening judicial punishment for exposing criminal conduct were routine business. This pattern—manufacture evidence, get caught, threaten sanctions, claim witness protection for co-conspirators, then schedule meetings as if normal—reveals the breathtaking audacity of Defendants who believe themselves so far above the law that being caught falsifying evidence merits not apology but attack. When attorneys respond to exposure of their crimes by threatening their victims with sanctions while claiming their co-conspirators need "protection," the corruption has reached levels that shock the conscience.

294.     The coercive power of this criminal enterprise is exemplified by Defendant

Madeline Costelli Pettry, a young, talented Professional Engineer carrying her father's

respected legacy in the engineering community. On prima facie evidence, she is honest,

vouched for by fellow engineers, and when approached in person, refused to participate

in any conspiracy. Yet in practice, the weight of the enterprise forced her compliance.

Despite knowing the engineering concerns were baseless, despite needing only

photographs and a site visit to resolve matters, she was compelled to allow Ros to control

her professional judgment, prevented from documenting her actual findings, and forced

to refuse direct communication with Plaintiff. This tragic corruption of a promising

young professional—forcing her to violate engineering ethics against her will—

demonstrates the enterprise's terrifying reach. When a criminal organization operating

under color of law can force licensed professionals to abandon their ethics, corrupt their

integrity, and violate their oaths despite their resistance, no professional in Biloxi is safe.

The enterprise doesn't merely corrupt the willing; it crushes the honest into compliance.

295.     Before filing this lawsuit, Plaintiff exhausted every conceivable remedy to avoid

this confrontation. He had engineer Terry Moran reach out directly to Peter Abide

seeking resolution. He texted Jerry Creel attempting compromise. He specifically tried to

avoid naming Madeline Pettry as a defendant, recognizing her unwilling participation and

attempting to spare a young professional from litigation. Every effort failed. Every olive

branch was rejected. Every attempt at reason met with escalation. Defendants'

intransigence transformed what should have been a simple administrative matter—

issuing a Certificate of Occupancy for a property that passed inspection—into an

impossible situation requiring a war of attrition. When citizens must resort to federal

litigation after exhausting every avenue of resolution, when they reluctantly name defendants they tried to protect, when simple building permits become federal cases because no other remedy exists, the municipality has failed its most basic functions. This lawsuit exists not because Plaintiff chose litigation but because Defendants made it the only option for survival.

296.     On public interest grounds, Plaintiff refrains from seeking compensatory damages against the City of Biloxi itself, recognizing that taxpayers should not bear the financial burden for the criminal enterprise operating within their government. From this municipal defendant, Plaintiff seeks only $1.00 in nominal damages and injunctive relief to reform the unconstitutional practices. The citizens of Biloxi are victims too—their tax dollars fund this corruption, their government has been captured, their rights are equally at risk. Plaintiff's restraint in seeking monetary damages against the City demonstrates this lawsuit's true purpose: not financial gain but restoration of constitutional governance. However, the individual defendants who personally profited from these violations, who collected $150/hour while destroying citizens' lives, who used public office for private enrichment—they must face personal liability for their crimes. The public interest demands that those who corrupted the government, not those who suffer under it, pay the price for these constitutional violations.

# VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

**AS TO DEFENDANT CITY OF BILOXI ONLY:**

**A.** Award nominal damages of $1.00 for the constitutional violations established herein;

**B.** Plaintiff explicitly waives and does not seek from the City of Biloxi: (1) any compensatory damages; (2) any punitive damages; (3) any attorneys' fees under 42 U.S.C. § 1988 or any other statute; recognizing that taxpayers should not bear the financial burden for the criminal enterprise operating within their government;

**C.** Issue declaratory judgment that the City's policies, customs, and practices violated Plaintiff's constitutional rights;

**D.** Enter permanent injunctive relief to reform unconstitutional municipal practices, including but not limited to: prohibiting delegation of governmental functions to private contractors; requiring direct citizen access to building officials; mandating compliance with administrative procedures before criminal prosecution; and establishing oversight mechanisms to prevent future constitutional violations;

**AS TO ALL OTHER DEFENDANTS:**

**E.** Assume jurisdiction over this case and the constitutional claims presented herein;

**E.** Assume jurisdiction over this case and the constitutional claims presented herein;

**F.** Construe this pro se complaint liberally, considering substance over form, and holding it to less stringent standards than formal pleadings drafted by attorneys;

**G.** Issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Individual Defendants violated Plaintiff's rights under the First and Fourth Amendments to the United States Constitution;

**H.** Enter preliminary and permanent injunctive relief to prevent continued violation of Plaintiff's constitutional rights, including:

1. Prohibiting Defendants from preventing Plaintiff's lawful occupation of his property that passed all inspections

2. Enjoining prosecution based on fabricated evidence

3. Prohibiting obstruction of public records access

4. Preventing interference with Plaintiff's communication with public employees

5. Requiring defendants' attorneys to withdraw from representation due to conflicts

6. Enjoining all warrantless surveillance of Plaintiff's property

7. Ordering cessation of organized surveillance operations using unmarked vehicles

8. Prohibiting Ros, any member of Currie Johnson & Myers, or any outside contractor from exercising building official, code enforcement, or other governmental functions they lack statutory authority to perform

9. Ordering Creel to resume direct communication with property owners

10. Declaring the attorney gatekeeping requirement unconstitutional

11. Restoring Plaintiff's direct access to all government services

12. Declaring that Biloxi city officials cannot delegate their statutory duties, including building code determinations, permit decisions, and enforcement actions, to outside contractors who lack statutory authority, oath of office, or governmental accountability

13. Enjoining all city officials from abdicating their statutory responsibilities by forcing citizens to communicate through private attorneys or other non-governmental intermediaries

14. Mandating Peter Abide and Currie Johnson & Myers to disclose all conflicts of interest including: (a) all family members' business relationships with City vendors, contractors, or regulated entities; (b) all board positions, consulting arrangements, or representation of entities doing business with the City; (c) all real estate ownership or interests involving City properties or City-regulated projects; (d) all financial relationships between firm members and City contractors, vendors, or permit applicants; with such disclosures to be updated quarterly and made publicly available

15. Declaring that qualified immunity does not extend to any member or employee of Currie Johnson & Myers, P.A., as they are private contractors not entitled to governmental immunity; or in the alternative, declaring that any qualified immunity has been forfeited through: (a) their participation in conduct that shocks the conscience; (b) violation of clearly established constitutional rights; (c) acting with malice and for profit; (d) usurpation of governmental functions without authority; and (e) manufacturing evidence and false affidavits

16. Mandating Prosecutor Robert G. Harenski provide sworn testimony explaining: (a) why he insisted Peter Abide must be present for all prosecutorial conferences despite being informed of Abide's conflict of interest as a named defendant in Plaintiff's federal cases;

(b) the nature and extent of Abide's supervision and control over municipal prosecutions;
(c) whether Abide directed, influenced, or participated in decisions regarding Plaintiff's
prosecution; and (d) why court-ordered discovery was withheld for 21+ days while
maintaining this supervision arrangement

17. Ordering the City of Biloxi to immediately produce all billing records, invoices, and fee
statements from Peter Abide, Currie Johnson & Myers, and all law firms under their
control, which Abide claimed were exempt from public disclosure; and mandating
Records Custodian Stacy Thacker provide sworn testimony explaining: (a) the legal basis
for exempting attorney billing records from public disclosure under Mississippi Public
Records Act; (b) whether Abide directed or influenced the exemption determination; (c)
why financial records of public expenditures were deemed exempt; and (d) all
communications with Abide regarding these exemption claims

18. Mandating Peter Abide provide a complete accounting of all City resources expended in
defending Petrini v. City of Biloxi, including all attorney fees, costs, and expenses; and
requiring sworn testimony explaining why he failed to respond to or pursue settlement
offers that sought no monetary damages from the City—only injunctive relief—thereby
unnecessarily expending public funds defending a case where Plaintiff explicitly seeks
only $1.00 from the City

19. Ordering the City of Biloxi to immediately retain independent outside counsel with no
connections to Currie Johnson & Myers, Abide, or any current City contractors to
represent the City's actual interests; or in the alternative, appointing independent counsel
or requesting a government attorney to represent the City given that: (a) Plaintiff seeks
only $1.00 in damages from the City; (b) current counsel faces irreconcilable conflicts

defending themselves while representing the City; and (c) the public interest requires unconflicted representation to achieve reform rather than protect individual defendants

20. Ordering Defendant Madeline Costelli Pettry, P.E. and Simpkins & Costelli, Inc. to immediately produce: (a) all actual engineering findings, calculations, and observations regarding 1606 Beach Boulevard, including any findings that issues were baseless or required only photographs and site visit to resolve; (b) all payment structures, retainer agreements, and compensation terms with the City or Defendant Ros for the review; (c) all communications with Ros or any City official regarding restrictions on documenting findings or communicating with Plaintiff; (d) disclosure of any conflicts of interest including relationships between firm principals and City officials or contractors; and (e) sworn testimony explaining why a licensed Professional Engineer allowed non-engineers to control professional engineering opinions

**I.** Award compensatory damages against all Individual Defendants, jointly and severally, for all damages suffered as a result of Defendants' constitutional violations, including but not limited to emotional distress, mental anguish, economic losses, and other consequential damages; provided that should any Individual Defendants successfully assert qualified immunity, Plaintiff explicitly waives and abdicates any indemnification or compensatory damages from the City of Biloxi for those immune defendants' actions, ensuring taxpayers bear no financial burden for individual misconduct;

**J.** Award punitive damages against all Individual Defendants for their willful, malicious, reckless, and profit-driven violation of Plaintiff's constitutional rights, in an amount sufficient to deter future constitutional violations motivated by financial gain;

**K.** Order disgorgement of all attorney fees earned by Defendants' counsel through unconstitutional conduct, including the $566,000+ billed by Currie Johnson & Myers, plus all fees billed by external law firms under their control including Defendant Michael E. Whitehead from Page & Mannino and any other affiliated firms, all earned while orchestrating these constitutional violations;

**L.** Award Plaintiff his costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 against all Individual Defendants only (explicitly not against the City of Biloxi);

**M.** Refer this matter to the Mississippi Bar for investigation of ethical violations;

**N.** Refer this matter to the Department of Justice for criminal investigation;

**O.** Order such other and further relief as this Court deems just, proper, and equitable under the circumstances;

**P.** Invite and consider amicus curiae briefs from: (a) government agencies including the Department of Justice Civil Rights Division, FBI, Mississippi Attorney General, and other federal and state law enforcement entities investigating municipal corruption; (b) disability rights organizations and the ADA community, given Plaintiff's documented narcolepsy and the denial of reasonable accommodations during these proceedings; (c) whistleblower protection organizations with expertise in retaliation against those exposing government corruption; (d) civil liberties organizations concerned with systematic constitutional violations; (e) professional engineering and legal ethics boards regarding the coercion of licensed professionals; and (f) any other entities whose expertise would assist the Court in understanding the broader implications of a municipality operating as a criminal enterprise;

**Q.** Grant all such other relief as justice requires and Leave to amend this Complaint as justice requires, including to correct minor factual dates, add additional parties and claims, and include additional events as they occur or are discovered;

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

Yuri Petrini

YURI PETRINI

Plaintiff, Pro Se 929 Division Street Biloxi, MS 39530 (305) 504-1323

yuri@megalopolisms.com